**Colleen A. WILEY (d/b/a Wiley Creations), Plaintiff,**

v.

**AMERICAN GREETING CORP., et al., Defendants.**

**Civ. A. No. 84–1344–S.**

United States District Court,
D. Massachusetts.

Sept. 24, 1984.

Paul J. Hayes, Weingarten, Schurgin, Gagnebin & Hayes, Boston, Mass., for plaintiff.

Cowan, Liebowitz & Latman, New York City, Fish & Richardson, John L. Welch, Wolf, Greenfield & Sacks, Boston, Mass., for defendants.

### MEMORANDUM AND ORDER

SKINNER, District Judge.

The plaintiff in this case, Colleen A. Wiley, is the founder and proprietor of a small business, Wiley Creations, which manufactures and sells stuffed teddy bears (known as "Wiley Bears"). Since its inception in 1979, Wiley Creations has sold about 6,000 bears, primarily in Massachusetts and the northeastern United States. Each of Wiley Creations' bears features a large red heart sewn on its left breast. A similar red heart-shaped design also appears on plaintiff's business cards and teddy bear merchandising tags. Apart from the cards and tags, however, plaintiff has not engaged in any advertising.

The defendants here are all national manufacturers, licensors and distributors of various children's toys, including teddy bears sporting heart-shaped designs. Although some of the defendants' bears bear only a slight resemblance to the "Wiley Bear", for the purposes of this opinion, such dissimilarities are unimportant.

On April 27, 1984, Wiley Creations filed this action alleging trademark infringement, unfair competition and false designation of origin. In substance, Wiley Creations claims that in January, 1980, it adopted "as its trademark for its teddy bears, the design of a heart disposed on its bears and has to date continuously used its trademark in said business ... in interstate commerce". (Complaint, ¶ 11). It further alleges that the defendants "have used said mark with the intent to appropriate the mark for their own use and benefit, all without permission of Plaintiff". (Complaint, ¶ 14). Plaintiff demands a permanent injunction and damages. The defendants uniformly denied all of Wiley Creations' substantive allegations.

Shortly after initiating discovery in June, 1984, all the parties moved for summary judgment.[1] The motions were accompanied by the requisite affidavits, declarations and exhibits. For the reasons stated herein, the defendants' motions for summary judgment and dismissal of plaintiff's complaint are hereby ALLOWED.

## Discussion

The standard to be applied in ruling upon a motion for summary judgment in a trademark infringement case was recently restated by the First Circuit Court of Appeals in *Astra Pharmaceutical Prod. v. Beckman Instruments*, 718 F.2d 1201 (1983). There, the court stated that

[s]ummary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." ... In passing on a summary judgment motion, the court must view the record and draw inferences in the light most favorable to the opposing party.

*Astra*, 718 F.2d at 1204 (citations omitted).

All the parties to this case have moved for summary judgment. All parties are thus estopped to assert any material issues of fact. The only question is whether the facts stated in the record with all possible favorable inferences to be drawn therefrom would warrant a judgment for the plaintiff as a matter of law.

■ The starting point in any trademark infringement case is always whether the complainant can establish the existence of a legally protectible trademark. J. McCarthy, *Trademark and Unfair Competition*, Second Edition, § 16.1 *et seq.* ("McCarthy"); *see also Park 'N Fly, Inc. v. Park & Fly, Inc.*, 489 F.Supp. 422 (D.Mass.1979). Where, as here, the plaintiff has not attempted to register the disputed mark with either the United States Patent Office or any appropriate state office, the mark and its use must satisfy the strictures of the common law.

■ A common law trademark may be proved in one of two ways. Either the mark must be shown to be "inherently distinctive" or, if not, it must be shown to have become distinctive by acquiring a "secondary meaning" in the minds of consumers. *President and Trustees of Colby College v. Colby College*, 508 F.2d 804, 807 (1st Cir.1975); *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 533 F.Supp. 75, 77 (S.D. Fla.1981), *aff'd* 716 F.2d 854 (11th Cir. 1983).

■ Before applying these rules of law to the mark at issue, it is important to clearly define the nature of the trademark in which plaintiff claims it has acquired rights. Here, plaintiff has made no allega-

---

1. Defendant Dakin & Co. moved separately from its co-defendants. In light of the similarity of the issues raised in their respective memoranda, however, all the defendants' motions will be treated together.

tions that it has obtained a trademark consisting of either the heart design itself, or the application of the heart design to stuffed animals generally. Wiley Creations argues that "[t]his case does not concern stuffed dogs, tie clips of Valentine/Christmas ornaments. The goods which are the subject matter of this case ... are teddy bears." (Plaintiff's Memorandum in Opposition to Defendant Dakin's Motion for Summary Judgment, pp. 2–3). Accordingly, the issue before this court is simply whether Wiley Creations' placement of an ordinary red heart on the left breast of an ordinary stuffed teddy bear is (or has become) sufficiently distinctive to constitute a common law trademark.

A review of the numerous photographic exhibits introduced by both parties clearly shows that the heart appearing on the Wiley Bear has exactly the same proportions and color as the countless hearts that appear on commonplace objects ranging from greeting cards and children's stuffed toys to tie clips and type face. Moreover, the placement of such a design on the left breast of a stuffed toy (directly over its traditionally presumed anatomical position in a real creature) can hardly be said to have originated with the plaintiff. As defendants point out, "[o]ne of the most widely recognized uses of a heart on the chest of a stuffed toy ... is Johnny Gruelle's famous Raggedy Ann and Andy dolls". (Defendant Dakin's Memorandum in Support of Its Motion for Summary Judgment, p. 3) (citing, Gruelle v. Molly-'es Doll Outfitters, 94 F.2d 172, 173 (3rd Cir.1937), a use that dates at least from 1915. Id. at 173. In light of the longstanding use of the heart motif as a decoration upon all manner of goods, I find the placement of a heart upon the left breast of the Wiley Bear is not inherently distinctive.

This conclusion finds ample support in the numerous prior cases holding that a simple geometric pattern affixed to an otherwise ordinary product is not inherently distinctive. Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp., 533 F.Supp. 75 (S.D.Fla. 1981); aff'd 716 F.2d 854 (11th Cir.1983) ("V" shaped design on tennis shoes not inherently distinctive); Application of David Crystal, Inc., 296 F.2d 771 (1961) (Colored bands on men's athletic socks held not inherently distinctive); Major Pool Equip. Corp. v. Ideal Pool Corp., 203 USPQ 577 (N.D.Ga.1979) (Geometric border design on pool liners held not inherently distinctive); The Federal Glass Co. v. Corning Glass Works, 162 USPQ 279 (TMTAB 1969) (Stylized cornflower design placed upon Corning cookware held not inherently distinctive); Re: Dassler, 134 USPQ 265 (TMTAB 1962) (Three colored stripes on Adidas tennis shoes deemed not inherently distinctive).

Even if a given geometric pattern is not inherently distinctive, however, a manufacturer may nevertheless acquire trademark rights in the symbol if the product and symbol together have achieved "secondary meaning" in the public eye. For example, in the Dassler case cited above, while the three parallel stripes placed upon Adidas tennis shoes were not considered inherently distinctive, the court found that "in view of (Adidas') extensive promotion of its "3 stripe" mark over the years together with the trade recognition of this design as indicating origin in (Adidas) ... (Adidas) has made a sufficient prima facie showing that the design in issue does identify its goods and distinguish them from the goods of others". Id. at 266.

In Colby College v. Colby College New Hampshire, 508 F.2d 804 (1st Cir.1975), the First Circuit Court of Appeals set out a standard for proving secondary meaning. At issue in that case was whether the name "Colby College" had gathered sufficient secondary meaning so as to constitute a trademark. There, the court stated that

Secondary meaning is established in a number of ways. First, from ... long and exclusive use... Second ... the size or prominence of the enterprise may warrant an inference that its [mark] has acquired secondary meaning .... Third, while secondary meaning is shown by success rather than by the mere fact of an enterprise's promotional efforts, ...

the normal consequence of substantial publicity may be inferred. . . .

*Id.* at 807–808 (citations omitted).

Applying these factors to the facts of the *Colby College* case, the First Circuit found initially that the plaintiff had operated its institution "since 1899 under the name of Colby College". *Id.* at 806. Second, the court noted that "plaintiff outdistances defendant in size, reputation and achievement". *Id.* at 808. Lastly, the plaintiff introduced evidence that "the name 'Colby College' is exclusively understood 'in the academic field as meaning the plaintiff' ". *Id.* at 808. Accordingly, the First Circuit found that plaintiff had established secondary meaning.

In *Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.*, 533 F.Supp. 75 (S.D.Fla.1981), plaintiff Brooks Shoe attempted to establish that it had acquired a trademark in the 'V' design that appears on the sides of Brooks shoes. Despite the sale by Brooks of more than 2,500,000 pairs of shoes in fiscal 1978, the implementation of a $747,000 advertising campaign that same year, and promotional activities and advertisements in prestigious magazines, such as "Runner's World", the court nonetheless concluded that "there is nothing inherently distinctive about the "V" and the efforts made by Brooks to promote a connection between the "V" and Brooks prior to January, 1979, were not so substantial that an inference of secondary meaning can be drawn therefrom". *Id.* at 81.

Applying the teachings of both *Colby College* and *Brooks Shoe* to the facts of the present dispute, it seems clear that Wiley Creations cannot possibly prove the type of consumer recognition required to establish secondary meaning. Since the inception of her business in 1979, plaintiff has sold only 6,000 bears. Plaintiff's affidavits further indicate that only a very small proportion of those bears were sold outside of Massachusetts. Moreover, plaintiff has not alleged or offered evidence that she has engaged in any advertising (other than the printing of business cards) of her product or that her bears have acquired even the slightest degree of distinctiveness in the eyes of consumers. By contrast, defendant R. Dakin & Co. has, since 1983, sold over 200,000 bears similar to the "Wiley Bear". (Memorandum of Law by Dakin in Opposition to Plaintiff's Motion for Summary Judgment, p. 3). Sales of defendant American Greetings "Care Bears" likewise totalled over $250,000,000 in 1983. In addition, American Greetings' advertising budget for Care Bears related products was approximately $9.2 million. *American Greetings Corp. v. Easter Unlimited, Inc.*, 579 F.Supp. 607, 221 U.S.P.Q. 875, 876 (S.D.N.Y.1983).

Pursuant to the analysis in the *Colby College*, I find that (1) Wiley Creations has been in business for only four and one-half years, (2) that Wiley Creations is a small enterprise with relatively modest sales, and (3) that plaintiff appears to have made no attempt to generate a secondary meaning for her heart design through advertising. Moreover, it seems clear that if sales of over two million pairs of shoes combined with a $747,000 advertising budget was deemed "not so substantial" as to justify an inference of secondary meaning in *Brooks Shoe*, 533 F.Supp. at 81, then Wiley Creations' sale of 6,000 bears, without more, surely cannot have created the requisite consumer recognition. Accordingly, I find that plaintiff has not met her burden of proof on the basis of the undisputed facts in this record.

Because secondary meaning cannot be established for the Wiley Bears, plaintiff cannot be said to have acquired a common law trademark in the heart design. Absent the existence of a protectible trademark plaintiff has no valid claim against any of the defendants. Accordingly, the defendants' motions for summary judgment are ALLOWED. The complaint is DISMISSED on the merits.